UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF ALABAMA

In Re

ANDRETTA INGE BENNETT                             Case No. 04-12530

    Debtor.

COASTAL WATERS FEDERAL CREDIT UNION,

    Plaintiff,

v.                                                Adv. No. 04-01116

ANDRETTA INGE BENNETT,

    Defendant

**ORDER DENYING COASTAL WATERS FEDERAL CREDIT
UNION'S MOTION FOR SUMMARY JUDGEMENT AND DENYING
COASTAL'S OBJECTION TO DISCHARGEABILITY**

J. Gullatte Hunter, III, Attorney for Debtor
Gregory B. McAtee, Attorney for Coastal Waters Federal Credit Union
Denise I. Littleton, Chapter 7 Trustee

This matter came before the Court on Coastal Waters Federal Credit Union's motion for summary judgment. However, upon Coastal's request, their motion for summary judgment was denied, and the Court commenced a hearing on Coastal's objection to dischargeability pursuant to 11 U.S.C. § 523(a)(2). The Court has jurisdiction to hear this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Order of Reference of the District Court. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I) and the Court has the authority to enter a final order. For the reasons indicated below, the Court is denying the objection to the dischargeability of the debt owed to Coastal Waters.

# FACTS:

Andretta Bennett, the debtor, has been a member of Coastal Waters Federal Credit Union for approximately three years. In September 2003, she went to Coastal seeking to consolidate some of her high interest credit card debts. A Coastal employee assisted Bennett and upon Coastal approving her credit application, Bennett was issued a credit card from Coastal with a $5,000 credit limit. Although Coastal approved Bennett's credit application, it brokered out its credit card services to a credit card servicer. On September 4, 2003, Bennett consolidated credit cards onto her new Coastal credit card by way of two balance transfers totaling $4,540.95. However, due to some billing error, either at Coastal[1] or its subcontracted servicer, these balance transfers did not show up on debtor's credit card statement until March 2004. The credit union manager at Coastal, Margaret Aldridge, testified that Coastal had no notice that these balance transfers had not posted because the credit card statement went directly from credit card servicer to debtor. From September 2003 to March 2004, Bennett used the credit card numerous times even though she admittedly knew the $4,540.95 had not posted, there was a $5,000 limit on the card, and that the account would be over the credit limit if and/or when the balance transfers posted. Sometime between September 2003 and January 8, 2004, Bennett charged $2,876.69 on the credit card. On January 8, 2004, Bennett made a payment of $2,876.69 on the credit card account, bringing her "posted" balance at that time down to zero, although the balance transfers had still not posted. Between January 24, 2004 and February 23, 2004, Bennett used the credit card multiple times at various Biloxi casinos taking cash advances accumulating over $5,000. The credit card statement shows that even after she was over her credit limit, Bennett's card still

---

[1] Coastal denies any error.

allowed her to take additional cash advances. Bennett admits she made these charges knowing that the card had a $5,000 limit and knowing that the September 2003 balance transfers had still not posted. Bennett admitted that she knew she was over her credit limit but continued to use the credit card anyway.

On February 24, 2004, Bennett was assessed an "overlimit fee" on her credit card account. On March 2, 2004, the balance transfers from September 2003 finally posted to her credit card account. This put her account balance at $9,813.57. On March 3, 2004, the day after the balance transfers had posted, Bennett went back to Coastal, this time seeking to consolidate two car loans. These two cars were a 1997 Lexus driven by Bennett's son and a 1999 Toyota Camry that she drives. Coastal loaned debtor an additional $11,265 to consolidate these loans. There was no evidence presented that Coastal checked Bennett's credit card balance or did a credit check before issuing this loan. At this meeting on March 3, 2004, Bennett did not reveal to Coastal that she had taken over $5,000 in cash advances on her Coastal credit card. Bennett did not reveal the balance transfer billing error during this meeting either. It is unclear whether Bennett knew the balance transfers had posted when this meeting occurred, but the credit card statement for the period closing March 12, 2004, shows the posting was made on March 3, 2004.

Bennett testified that she first spoke to an attorney about bankruptcy in April 2004. On April 30, 2004, Bennett filed for Chapter 7 bankruptcy. At time of filing, debtor's schedules listed approximately $28,000 in unsecured debt and approximately $21,000 in secured debt. Her schedules listed her income at $1,400 per month. Most of debtor's unsecured debts are gambling debts. Bennett testified that prior to her bankruptcy filing she did not receive any notice, written or oral, from Coastal or the credit card servicer that her credit card privileges had been revoked.

Likewise, she testified that her card had never been rejected. Debtor testified that at the time she incurred the credit card charges she fully intended to repay the debts. Bennett further testified that when the debts were incurred she had been working two jobs, making approximately $2000 per month, but lost one of jobs prior to filing bankruptcy. Bennett has not used the credit card since February 23, 2004. Although Coastal's manager, Margaret Aldridge, testified that Coastal credit cards are automatically revoked when the credit limit is exceeded, the credit card statement shows that the card was used for cash advances after the account was over the limit. There was no evidence presented that either the credit union or the credit card servicer revoked debtor's use of the card prior to her bankruptcy filing. It is unclear how or why the balance transfers did not post until six months after they were made.

## LAW

The issue of this case is whether debtor's credit card debt to Coastal is excepted from discharge in her Chapter 7 bankruptcy case. The purpose of the Bankruptcy Code's discharge provisions is to allow insolvent debtors a chance to "make peace with their creditors, and enjoy 'a new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of pre-existing debt.'" *Chase Manhattan Bank v. Ford (In re Ford)*, 186 B.R. 312, 316 (Bankr. N.D. Ga. 1995)(quoting *Grogan v. Garner*, 498 U.S. 279, 286 (1991)). However, this opportunity is only afforded to the honest, but unfortunate, debtor. *Id.* To make sure only honest debtors get the benefit of this fresh start, the Code provides exceptions to its discharge provisions. These exceptions to discharge are contained in 11 U.S.C. § 523.

The exception relevant to this case is contained in § 523(a)(2)(A), which provides in pertinent part:

-4-

> (a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt–
> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by–
> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's . . . financial condition[.]

11 U.S.C. § 523(a)(2)(A). Because the fresh start is one of the Code's most important objectives, exceptions to discharge are to be narrowly construed in favor of the debtor. *Hope v. Walker (In re Walker)*, 48 F.3d 1161 (11th Cir. 1995); *Equitable Bank v. Miller (In re Miller)*, 39 F.3d 301 (11th Cir. 1994). The creditor has the burden to prove all elements of fraud under § 523(a)(2)(A). *Miller*, 39 F.3d at 304. The creditor must prove each element by a preponderance of the evidence. *Grogan*, 498 U.S. at 291.

In *First National Bank of Mobile v. Roddenberry*, 701 F.2d 927, 932 (11th Cir. 1983), the Eleventh Circuit held that under § 17a(2) of the Bankruptcy Act (the predecessor to the present § 523(a)(2)) only after unequivocal and unconditional revocation of the credit card holder's right to use and possession of the card has been clearly communicated to the cardholder, will further use of the card result in nondischargeable debts obtained by false pretenses or false representations. In the instant case, there had been no unequivocal and unconditional revocation of the debtor's right to use and possession of her Coastal credit card prior to the incurrence of the charges in question. Therefore, according to Eleventh Circuit law, the debt was not obtained by false pretenses or false representations. *Id.*; *Compass Bank v. Meyer (In re Meyer)*, 296 B.R. 849 (Bankr. N.D. Ala. 2003).

However, 523(a)(2)(A) also applies to debts for money or property obtained by "actual fraud". Actual fraud was not part of the Eleventh Circuit's analysis in *Roddenberry* because the

Case 04-01116    Doc 13    Filed 12/09/04    Entered 12/09/04 15:10:01    Desc Main
Document    Page 5 of 10

term was not a part of § 17a(2). In *Roddenberry*, the Eleventh Circuit noted that the changes to § 17a(2) when it was recodified at 11 U.S.C. § 523(a)(2) "may alter the outcome in certain cases where debtors obtain credit without a present intention of repayment" and that "one commentator suggests that Congress' addition of the term 'actual fraud' to the 'false pretenses and false representation' language of section 17a was intended to eliminate the distinction between overt and implied misrepresentation . . . ." *Roddenberry*, 701 F.2d at 930 n. 3. However, the Court did not express an opinion, at that time, regarding the effect of the additional language. *Id.* Bankruptcy courts within the Eleventh Circuit have since held that a credit card debt may still be held to be nondischargeable, even if the cardholder's rights had not previously been revoked, if there was actual fraud. *See Universal Bank, N.A. v. Slaton (In re Slaton)*, Ch. 7 Case No. 00-10108-MAM-7, Adv. No. 00-1050, (Bankr. S.D. Ala. Aug. 30, 2000); *Fleet Credit Card Services, L.P. v. Kendrick (Matter of Kendrick)*, 314 B.R. 468 (Bankr. N.D. Ga 2004); *FDS National Bank v. Alam (Matter of Alam)*, 314 B.R. 834 (Bankr. N.D. Ga. 2004); *Compass Bank v. Meyer (In re Meyer)*, 296 B.R. 849 (Bankr. N.D. Ala. 2003); *AT&T Universal Card Services Corp. v. Reach (In re Reach)*, 225 B.R. 236 (Bankr. N.D. Ala. 1997); *American Express Travel Related Services Company, Inc. v. McKinnon (In re McKinnon)*, 192 B.R. 768 (Bankr. N.D. Ala. 1996); *Chase Manhattan Bank, N.A. v. Ford (In re Ford)*, 186 B.R. 312 (Bankr. N.D. Ga. 1995); *Chase Manhattan Bank, N.A. v. Carpenter (In re Carpenter)*, 53 B.R. 724 (Bankr. N.D. Ga. 1985).

The elements to prove "actual fraud" under § 523(a)(2)(A) are based on the traditional elements of common law fraud. *McKinnon*, 192 B.R. at 771. Thus, to prevail under that section, a creditor must prove that:

(1) the debtor made representations;
(2) at the time, the debtor knew the representations were false;
(3) the debtor made the false representations with the purpose and intention of deceiving the creditor;
(4) the creditor justifiably relied on such representations; and
(5) the creditor sustained a loss as a result of the representations.

*See Meyer*, 269 B.R. at 858; see also *Field v. Mans*, 516 U.S. 59 (1995); *Reach*, 225 B.R. at 239; *McKinnon*, 192 B.R. at 771.

Credit card transactions are governed by contractual agreements between the cardholders and the card issuers. These agreements typically bind the debtor to repay the debt in at least minimum specified installments over time with interest. "In using a credit card, a debtor represents only that she intends to abide by that agreement and has made a false representation only if, at the time the debt is incurred, she intends to breach her agreement." *Meyer*, 296 B.R. at 859; *Reach*, 225 B.R. at 239. "Therefore, a credit card is not nondischargeable for actual fraud unless the debtor did not intend to honor the terms of the credit agreement at the time the charges were made or the cash advances were taken." *Id.*; *see also McKinnon*, 192 B.R. at 768; *Ford*, 186 B.R. at 312; *Carpenter*, 53 B.R. at 724.

This case is different than most credit card dischargeability cases because the debtor had face-to-face contact with the creditor, Coastal. Debtor not only physically visited Coastal when she was approved for the credit card, but a Coastal representative personally helped debtor consolidate credit card debts through balance transfers amounting to $4,540.95 onto the Coastal credit card. Several months later, debtor again personally visited Coastal, and Coastal consolidated two car loans for debtor. It is not clear what, if any, representations were made by

the debtor to Coastal during these encounters. Coastal has not met its burden of proving that debtor acted with any actual fraud during these personal encounters between debtor and Coastal.

The only other representations that debtor made in using her credit card were that she would abide by the terms of the credit card agreement. In order to show that these representations were false, Coastal would have to show that she did not intend to repay the debts according to the contract terms. *Meyer*, 296 B.R. at 859; *Reach*, 225 B.R. at 236; *see also Kendrick*, 314 B.R. at 473 ("a debtor commits actual fraud for purposes of § 523(a)(2)(A) if the debtor uses a credit card without the actual, subjective intent to pay the debt thereby incurred."). Because an intent not to repay can rarely be shown by direct evidence, such intent may be inferred from the totality of the circumstances. *Meyer*, 296 B.R. at 859; *Reach*, 225 B.R. at 240. Intent to pay is quite different than ability to pay. *Alam*, 314 B.R. at 841. Many, if not most, consumers use credit cards specifically because they don't have the present ability to repay the debt. *Meyer*, 296 B.R. at 859; *Reach*, 225 B.R. at 239. The determination of intent must be made on a case by case basis. *Carpenter*, 53 B.R. at 730. Although *Carpenter* listed twelve factors relevant to the determination of a debtor's intent to repay, the court stated those factors are not all-inclusive, and may not always be helpful.[2] *Id.*

---

[2]Those factors are: (1) the length of time between the charges made and the filing of bankruptcy (2) whether or not an attorney has been consulted concerning the filing of bankruptcy before the charges were made; (3) the number of charges made; (4) the amount of the charges; (5)the financial condition of the debtor; (6) whether the charges were above the credit limit of the account; (7)did the debtor make multiple charges on the same day; (8) whether or not the debtor was employed; (9) the debtor's prospects for employment; (10) the financial sophistication of the debtor; (11) whether there was a sudden change in the debtor's buying habits; and (12) whether the purchases were made for luxuries or necessities.

Case 04-01116    Doc 13    Filed 12/09/04    Entered 12/09/04 15:10:01    Desc Main
Document      Page 8 of 10

In reviewing the totality of the circumstances in the instant case, the Court finds that Coastal has failed to meet its heavy burden of proving that Ms. Bennett had the requisite intent to not payback the cash advances at the time they were taken. Although the evidence is undisputed that Bennett knew of the billing error and took cash advances knowing she would be over her limit if the balance transfers posted, this does not prove that she did not have the intent to repay those advances when she took them. In fact, the debtor's January 14, 2004, credit card statement indicates that she had previously amassed $2,876.69 on her credit card sometime before that statement date (which exceeded her credit limit by more than $2,000), and debtor made a payment for $2,876.69, bringing her posted balance back to zero. This instance of Debtor exceeding her limit in the past and then paying off those obligations rebuts the notion that she did not have the intention to repay the debts when they were incurred. Although debtor made multiple cash advances during a one month period from January 24, 2004, to February 23, 2004 (including five advances in one day), she did not file bankruptcy until April 30, 2004, more than two months after her last charge on the card. There is no evidence that debtor was considering bankruptcy or had spoken to a bankruptcy attorney at the time the debts were incurred. Additionally, the debtor testified at trial that she intended to pay the debts when they were incurred. The debtor also testified that she was working two jobs at the time the debts were incurred, but lost one of the jobs prior to filing bankruptcy. This loss of secondary income was a factor that led to her bankruptcy.

Although debtor's debt to income ratio was high, Coastal did not prove that she did not intend to repay her debts when they were incurred, nor did Coastal prove that debtor could not make her minimum monthly payments on the debts when she incurred them. Even though debtor

Case 04-01116    Doc 13    Filed 12/09/04    Entered 12/09/04 15:10:01    Desc Main
Document      Page 9 of 10

knew of the bank's error and knowingly took cash advances in excess of her limit, it was Coastal (or that of its subcontracted servicer) that caused the error, and Coastal should not be allowed unlimited recourse to correct the damage precipitated by its own irresponsibility. *See FCC National Bank v. Gilmore (In re Gilmore)*, 221 B.R. 864, 875 (Bankr. N.D. Ala. 1998). ("A creditor who recklessly bestows credit, should not benefit from such a lack of caution, especially when the exercise of rudimentary precautions could have prevented its losses."). Although Coastal contends debtor's gambling away the cash advances somehow warrants nondischargeability of the debts, without intent to not repay, this argument fails. *See AT&T Universal Card Services Corp. v. Reynolds (In re Reynolds)*, 221 B.R. 828, 840 (Bankr. N.D. Ala. 1998) (credit card issuers that allow cardholders to take cash advances on ATMs in casinos are on notice that the cardholders may use the money to gamble, and that some gamblers are poor credit risks).

Because Coastal failed to prove by a preponderance of the evidence that Ms. Bennett incurred debts on her card after unequivocal revocation, or that she had no intention of repaying those debts at the time they were incurred, the Court finds that Ms. Bennett's debt to Coastal is discharged. Accordingly, it is hereby ORDERED that Coastal Waters Federal Credit Union's motion for summary judgment is DENIED. Furthermore, it is ORDERED that Coastal Waters Federal Credit Union's objection to dischargeability is DENIED.

Dated: December 9, 2004

/s/ Margaret A. Mahoney
MARGARET A. MAHONEY
U.S. BANKRUPTCY JUDGE